UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-MC-22022-UNA/JG

IN THE MATTER OF
THE EXTRADITION OF
MARK BENJAMIN
_____/

**ORDER CERTIFYING EXTRADITION OF MARK BENJAMIN**

This matter is before the Court on the Government's Complaint/Application for Extradition requesting that Mark Benjamin be extradited to the United Kingdom. [ECF No. 1]. Benjamin is presently detained pending conclusion of the extradition proceedings. [ECF No. 12]. The United States filed a memorandum in support of extradition [ECF No. 17]; Benjamin filed a response objecting to extradition [ECF No. 19]; and the United States filed a reply [ECF No. 20].

The Undersigned held a hearing lasting more than an hour, addressing the issues discussed in the parties' legal memoranda and reviewing the evidentiary submission in support of extradition. [ECF No. 21]. After the hearing, the Undersigned ordered additional briefing on discreet topics. [ECF No. 22]. Both Benjamin and the United States filed memoranda in response to the Undersigned's Order. [ECF Nos. 23; 24].

The Undersigned has reviewed the law, the parties' memoranda, the documents from the United Kingdom, and the relevant treaty between the United States and the

United Kingdom. For the reasons articulated below, the Undersigned hereby **GRANTS** the Government's request for an order certifying extradition.

**I.     BACKGROUND**

Mark Benjamin was arrested in this District on June 2, 2021, on a warrant and complaint issued pursuant to 18 U.S.C. § 3184. [ECF No. 1]. The Court held a detention hearing on June 10, 2021, to consider the Government's Request for Detention Pending Extradition Proceedings. [ECF No. 7]. The Court heard argument on whether Benjamin should be detained pending the conclusion of his extradition proceeding, and the Government's request was granted. [ECF No. 12].

The United Kingdom seeks Benjamin's extradition to try him on four counts[1] of child cruelty, in violation of United Kingdom law, to wit: Section 1 of the Children and Young Persons Act 1933, which is punishable by up to ten years' imprisonment. Benjamin allegedly committed these offenses within the jurisdiction of the United Kingdom.

---

[1]     The Complaint filed by the Government referenced only one count of child cruelty. [ECF No. 1]. As part of the Government's evidentiary submissions, however, it produced documents indicating that an additional warrant was issued by the United Kingdom and extradition was being sought on three additional counts of child cruelty. [ECF No. 17-1, pp. 28-29, 49-50, 62].

Benjamin was first arrested on January 24, 2020, on suspicion of child cruelty and assault by beating[2] against his minor daughter, V.B. He was released on bond and ordered to appear in court on May 10, 2020. Benjamin failed to appear at this and future proceedings. [ECF Nos 7; 17-1, p. 70]. In July 2020, United Kingdom authorities became aware that Benjamin was residing in Florida. [ECF No. 7].

Based on this, a magistrates' court sitting in Highbury Corner, London, United Kingdom issued a warrant for Benjamin's arrest on October 27, 2020, for one charge of child cruelty and one charge of assault by beating. *Id*. A further warrant was issued on July 6, 2021, for three additional counts of child cruelty. [ECF No. 17-1, pp. 49-50].

Detective Constable Jeyanthini Rajeskanna's ("Detective Rajeskanna") affidavit outlines the following relevant facts as evidence of the four crimes with which Benjamin has been charged [ECF No. 17, pp. 26-40]:

The indicted charges involve four instances of child cruelty, covering the following incidents: (1) Between May 23, 2019 and January 17, 2020, Benjamin regularly slapped V.B. around the ears; (2) A specific incident on May 24, 2019, where Benjamin punched V.B. in the face, causing a black eye, bruising, and swelling to her face; (3) Between June

---

[2] As explained by Crown Prosecutor Susan Matthews, the "assault by beating was charged as an alternative to the child cruelty for the incident on [January 16, 2020]. [ECF No. 17-1, p. 61]. However, it is the Crown Prosecution's intent to proceed forward on the child cruelty theory of offense. *Id*. Therefore, functionally, these two counts represent a single criminal action.

1, 2019 and July 31, 2019, Benjamin would instruct V.B. to bend over with her trousers and knickers pulled down, and repeatedly strike her on her bottom with his shoe; and (4) A specific incident on January 16, 2020, where Benjamin punched and slapped V.B.'s face, head, and ears, causing a cut to her ear, and a lump to the top of her head.

Detective Rajeskanna interviewed V.B. after one of V.B.'s schoolteachers confiscated a note in which V.B. disclosed to her friends that Benjamin had been striking her. In the interview, V.B. described how Benjamin punched her in the eye on May 24, 2019, giving her a black eye. She said she had been sitting on the sofa and Benjamin became angry with her, began shouting and stuck her. Immediately after the incident, Benjamin took her and her siblings to Rome so V.B.'s mother would not see the injuries. Due to the punch, V.B.'s ears began to ring, she was bleeding, and temporarily lost sight.

V.B. next disclosed that Benjamin had punched her on the ears and head, causing a bump, on January 16, 2020. V.B. described Benjamin as an individual who cannot control his emotions and becomes angry. This conduct escalates when her mother is not present. V.B. stated that her father would slap her around the ears on a fortnightly basis (i.e., every two weeks).

M, V.B.'s mother, gave a statement to the police on May 19, 2021. M described how, in June or July of 2019, she witnessed Benjamin instruct V.B. to go to the sofa, bend over,

4

and pull her trousers and knickers down. Benjamin next began striking V.B.'s bottom with his shoe and increased the force after M tried to intervene.

M has seen Benjamin strike V.B. on two occasions. Additionally, M informed police that in July 2019, she saw swelling on V.B.'s ear and V.B. told M that Benjamin had slapped her and caused the injury. M also informed police that her other children, M.B. and S.B., confirmed Benjamin struck V.B. and caused injury on May 24, 2019.

On June 14, 2021, Danielle Bastienne, a teacher at V.B.'s school, gave a statement to police letting them know she is the teacher who confiscated the note.

On May 8, 2020, Doctor Paul De Keyser ("Doctor Keyser") gave a statement to police. Doctor Keyser examined V.B. on January 29, 2020 and observed marks on V.B's head, bruising on her ear, swelling, and an abrasion, which were consistent with V.B.'s description of abuse.

On January 24, 2020, Benjamin was arrested at his home. Benjamin was interviewed the following day and denied all allegations.

As part of the follow-up investigation, the police obtained a video interview of V.B., a copy of the confiscated note, and verification of the trip to Rome.

On May 28, 2021, the United States Attorney's Office filed a Complaint [ECF No. 1] in this District seeking a warrant for Benjamin's arrest pending his extradition to the United Kingdom. The Court issued an arrest warrant that same day. According to the

5

Complaint, the United States was acting on the request from the Government of the United Kingdom, pursuant to 18 U.S.C. § 3184 and its extradition treaty[3] with the United States ("the 2004 Treaty").

## II.   APPLICABLE LAW

A foreign or international extradition proceeding is not a criminal case. *Martin v. Warden, Atlanta, Pen.*, 993 F.2d 824, 829 (11th Cir. 1993). Formal extradition is a diplomatic process, governed generally by the applicable extradition treaty and the federal extradition statutes, 18 U.S.C. §§ 3181-3196. *In re Extradition of Shaw*, No. 14-mc-81475, 2015 WL 521183, at *4 (S.D. Fla. Feb. 6, 2015). Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to international extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3); *Afanesjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981); *Bovio v. United States*, 989 F.2d 255, 259 n.3 (7th Cir. 1993).

---

[3]   Extradition Treaty Between the Government United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC. NO. 108-23 (2004) as amended by the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union, signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument") (collectively referenced hereinafter as the "2004 Treaty").

The Court's role is limited; the purpose of an extradition proceeding is to decide only the sufficiency of the charge under the treaty. *See Neely v. Henkel*, 180 U.S. 109, 123 (1901). This limited inquiry into the sufficiency of the evidence is akin to a finding of probable cause. *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004) (equating sufficient evidence to probable cause).

Although the Court retains a role in extradition proceedings, the Eleventh Circuit has stated:

> Extradition ultimately remains an **Executive** function. After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender. The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not.

*Martin*, 993 F.2d at 829 (emphasis added).

A court is required to certify extradition when the following five factors exist: (1) The judicial officer is authorized to conduct the extradition proceedings; (2) The court has jurisdiction over the fugitive; (3) The applicable treaty is in full force and effect; (4) The crimes for which surrender is requested are covered by the applicable treaty; and (5) There is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *See In re Extradition of Shaw*, 2015 WL 3442022, at *5 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

**III.     ANALYSIS**

    **a.  The Undersigned is Authorized to Conduct the Extradition Proceeding**

There is no dispute over the Undersigned's authority to preside over an extradition proceeding. The extradition statute provides that extradition proceedings may be held by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" and "[i]f, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same." 18 U.S.C. § 3184. In the Southern District of Florida, "[e]ach United States Magistrate Judge . . . may . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." Local Rules, Magistrate J. Local R. 1(a)(3).

    **b.  The Court has Jurisdiction Over Benjamin**

Benjamin was arrested within the jurisdictional boundaries of the Southern District of Florida; therefore, the Court has jurisdiction over him. 18 U.S.C. § 3184; *see also Pettit v. Walshe*, 194 U.S. 205 219 (1904) (providing that a marshal is required to bring a foreign fugitive sought for extradition before a "proper officer in the state where he was found").

### c. The 2004 Treaty is in Full Force and Effect

Benjamin urges the Undersigned to take the view that the United Kingdom's exit from the European Union on February 1, 2020 invalidated the 2004 Treaty and the United States and the United Kingdom reverted to the treaty as it existed before amendment by the Instrument ("the 2003 Treaty"). In essence, Benjamin is asking this Court to determine which treaty binds the United States. The Government contends that treaty recognition is an Executive function, and the Court must defer to the U.S. Department of State on this issue.

As evidence that the 2004 Treaty remains in effect, the Government provided an affidavit from Tom Heinemann, an Attorney Advisor in the Office of Law Enforcement and Intelligence at the Department of State. [ECF No. 20-1]. Heinemann explains the Executive Branch's position on the applicability of the 2004 Treaty:

> The [2004 Treaty], like [the 2003 Treaty], remains in effect notwithstanding the United Kingdom's withdrawal from the European Union. Nothing in [the 2003 Treaty, or the 2004 Treaty], provides or contemplates that the amendments made to [the 2003 Treaty] by [the 2004 Treaty] would cease to apply in the event the United Kingdom ceases to be a Member State of the European Union . . . .
>
> As a result of the fact that [the 2004 Treaty] remains in force . . . [t]he documents submitted by the United Kingdom in support of their request for Mr. Benjamin's extradition are properly authenticated because they bear the certificate or seal of the Home Office, which is specifically identified in Article 9 as an appropriate entity within the United Kingdom to provide such an authentication.

*Id.* at ¶¶ 6, 7.

Benjamin argues that the Court is free to interpret the language of the 2004 Treaty (language which he claims renders it invalid) and reach its own conclusions as to whether the 2004 Treaty is in effect. However, there is a vast difference between the Court's ability to interpret the meaning of the language within a treaty -- a situation where the Court must still afford the Executive's interpretation "great weight," *see Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) -- and the Court's ability to hold that a treaty is not even *in effect*: something it cannot do in contravention of the Executive. *Kastnernova*, 365 F.3d at 986 (deferring to Executive's determination on whether a treaty had lapsed).

As the Eleventh Circuit recently stated:

> Given these understandings about the division of authority and expertise between the executive and judicial branches, we must be careful to "observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other." *Franklin Mint Corp. v. Trans World Airlines, Inc.*, 690 F.2d 303, 311 (2d Cir. 1982). On matters of construction, courts have the final word; the views of the Executive, while important, are "not conclusive." *Factor v. Laubenheimer*, 290 U.S. 276, 295, 54 S.Ct. 191, 78 L.Ed. 315 (1933). On matters of **recognition,** by contrast, we **defer** to the Executive's authority to make treaties and conduct our foreign affairs. *See, e.g.,* [*Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Doe v. Braden*, 57 U.S. 635, 657 (1853)].

*Arias Leiva v. Warden*, 928 F.3d 1281, 1289 (11th Cir. 2019) (emphasis added).

Moreover, the Honorable Rodney Smith has already rejected Benjamin's reading of the 2004 Treaty, and the Undersigned agrees with Judge Smith's reasoning that

10

> [m]erely because the 2004 Instrument incorporates terms of another Agreement, to which the United Kingdom is no longer a party, does not mean that the 2004 Instrument terminated. Nothing in the 2004 Instrument makes it dependent on the United Kingdom's continued participation in the EU and thereby continued participation in the June 25, 2003 Agreement on Mutual Legal Assistance with the European Union. Further, the EU is not a party to the 2004 Instrument, which is only between the United Kingdom and the United States.

*Flynn v. Barr*, 20-60-60610, 2020 WL 9458644, at *1 (S.D. Fla. June 22, 2020).

However, even if the Undersigned were to agree with Benjamin's logic on the impact of the United Kingdom's exit from the European Union on the 2004 Treaty, the Executive's contrary position -- that the United States recognizes the 2004 Treaty -- is entitled to judicial deference. Therefore, the Undersigned will apply the 2004 Treaty.

### d. Child Cruelty is an Extraditable Offense

The 2004 Treaty allows for the return of fugitives sought for trial or punishment on "extraditable offenses," which are later defined as offenses "punishable under the law in both States by deprivation of liberty for a period of one year or more or by a more severe penalty." [ECF No. 17-1, p. 12].

Benjamin's argument against extradition is twofold: (1) child cruelty is an "either way" offense, which means it is currently impossible to know if the offenses are punishable in the United Kingdom by deprivation of liberty for a period of one year or more; and (2) the offense involving striking V.B.'s bottom with a shoe is not a crime in the United States, violating the "dual criminality" requirement.

11

"Either way" offenses are crimes which may be heard in magistrates' court or, upon request of the defendant or decision by the presiding magistrate, dealt with in the Crown Court.[4] [ECF No. 23-1]. If the case is dealt with in magistrates' court, the maximum a defendant can be incarcerated for on a single offense is six months. *Id.* In contrast, if the case is sent to Crown Court, the six-month limitation on incarceration no longer exists. *Id.* The Crown Court, unlike magistrates' court, may sentence a defendant charged with child cruelty up to ten years of incarceration. *Id.*

Benjamin argues that the "either way" nature of his offenses means that his case *may* remain in magistrates' court. This, he concludes, means the offenses are not extraditable because his sentence *could* be limited to six months, which falls outside the 2004 Treaty's definition of an extraditable offense. Although the Crown Prosecutor *may* seek transfer to Crown Court, Benjamin avers that this request receives no deference by the magistrate.

The Government contends that the uncertainty of the forum in which Benjamin's case will be handled -- and the uncertainty of whether he will be subject to a maximum of six months or ten years' incarceration -- does not preclude extradition. Instead, it says the scenario clearly meets the definition of an extraditable offense in the 2004 Treaty.

---

[4] The United Kingdom maintains a website detailing its court system, sentencing, and functions of the judiciary. *See* Courts and Tribunals Judiciary, You and the Judiciary, *available at* https://www.judiciary.uk/you-and-the-judiciary/ (last visited Oct. 1, 2021).

In support of its position, the Government offers declarations from the State Department and Susan Matthews, a specialist prosecutor in the United Kingdom's Extradition Unit. Both declarants agree that "either way" offenses meet the definition of an extraditable offense in the 2004 Treaty.

As stated by the Eleventh Circuit, "[o]n matters of construction, courts have the final word; the views of the Executive, while important, are not conclusive." *Arias*, 928 F.3d at 1289. However, while the Court may have the final word, "[w]hen the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [the Court] must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo*, 457 U.S. at 184.

To be sure, it is possible that Benjamin may remain in magistrates' court and be eligible for a sentence no greater than six months. It is also possible that Benjamin may be sent to Crown Court and be eligible for a sentence up to ten years. The language of the 2004 Treaty does not require certainty in sentencing. Just as a defendant charged with a felony in the United States *could* receive a non-custodial sentence and still be eligible for extradition, Benjamin is extraditable on the current *possibility* of facing more than one year incarceration. Here, there is no extraordinarily strong contrary evidence to justify a rejection of the treaty parties' agreement that Benjamin's alleged conduct allows extradition.

As an additional, single-count-based argument, Benjamin challenges the criminality of the child cruelty offense, where he is accused of striking V.B. with his shoe. He says this alleged conduct is permitted in the United States as corporal punishment and, thus, violates the dual criminality requirement.

Dual criminality requires that the charged act be criminal in both jurisdictions. *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1307 (11th Cir. 2000). Beyond that, it "does not require that the name by which the crimes is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries." *Id.* (quoting *Collins v. Loisel*, 259 U.S. 309, 312 (1922)).

In support of his argument, Benjamin cites Florida Statute § 39.01(2), which states "[c]orporal discipline of a child by a parent or legal custodian for disciplinary purposes does not itself constitute abuse when it does not result in harm to the child." Fla. Stat. § 39.01(2). Benjamin argues, therefore, his conduct, as alleged, is not a crime in Florida or the United States and that he cannot be extradited on that offense.

When evaluating corporal punishment, the Florida Supreme Court has stated "[t]hus, it is not that felony child abuse by a parent is a nonexistent crime, but rather a parent may assert as an affirmative defense his or her parental right to administer 'reasonable' or 'nonexcessive' corporal punishment, i.e., a typical spanking, in a prosecution for simple child abuse." *Raford v. State*, 828 So.2d 1012, 1020 (Fla. 2002).

14

Because this theory is an affirmative defense, the Undersigned may not consider its applicability in determining the sufficiency of the evidence. *In re Extradition of Shaw*, 2015 WL 3442022, at *4 ("Courts have determined that affirmative defenses to the merits of the charge(s) are not to be considered at extradition hearings." (collecting cases)).

On these bases, the Undersigned finds that child cruelty is an extraditable offense, despite its "either way" status. I also additionally find that all four counts of child cruelty meet the dual criminality requirement.

### e. There is Sufficient Evidence to Support the Four Counts of Child Cruelty

Because I have determined that the 2004 Treaty applies to this Extradition proceeding, I also find that the documents submitted by the Government comply with the authentication requirements of the 2004 Treaty and are admissible for consideration.

The facts as outlined in this Section I Order are retrieved from the Government's submitted documents and are sufficient to support a finding of probable cause for four counts of child cruelty.

## IV. FINDINGS

Having reviewed the pleadings, the record, the exhibits, and having heard the arguments of counsel, the Undersigned makes the following findings:

1. This Magistrate Judge is a judicial officer authorized under 18 U.S.C. § 3184 to conduct an extradition hearing.

15

2. This Court has personal jurisdiction over Mark Benjamin, who was residing in Broward County at the time of his arrest and who is presently in custody in this District. This Court also has subject matter jurisdiction over these proceedings.

3. There is currently in force an extradition treaty between the United States and the United Kingdom.

4. Benjamin has been charged in the United Kingdom with four counts of child cruelty, which correspond to a State of Florida felony offense. This offense carries a maximum penalty of more than one-year imprisonment in both countries.

5. There is probable cause to support the charges, arrest, and extradition.

**V.   CERTIFICATION AND ORDER**

Based on the foregoing findings, the Undersigned CERTIFIES to the Secretary of State that Mark Benjamin is subject to extradition to the United Kingdom for the offenses for which the United Kingdom seeks extradition.

**IT IS THEREOFRE ORDERED** that the United States Attorney for this judicial district forward a copy of this Certification and Order, together with a copy of all transcripts of proceedings, to the Secretary of State.

**IT IS FURTHER ORDERED** that Mark Benjamin remain committed to the custody of the United States Marshal pending final disposition of this matter by the Secretary of State. Upon the arrival of agents or officers of the United Kingdom, Mark Benjamin, together with any evidence incidental to his arrest, shall be transferred to the custody of those agents or officers at such time and place as mutually agreed upon by the United States Marshal and the duly authorized representative of the United Kingdom to be transported to the United Kingdom.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on October 7, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record